(No. 88-CC-0307–)

*In re* APPLICATION OF WARREN H. YOHO and MARIDELL A. YOHO

*Opinion filed November 28, 1989.*

HARLAN HELLER, for Claimants.

NEIL F. HARTIGAN, Attorney General (GREGORY THOMAS PATRICK CONDON, Assistant Attorney General, of counsel), for Respondent.

MONTANA, C.J.

This is a claim for benefits filed pursuant to the

Illinois National Guardsman's and Naval Militiaman's Compensation Act (Ill. Rev. Stat., ch. 129, par. 401 *et seq.*) (hereinafter referred to as the Act), due to the death of Specialist Fourth Class (SP4) Larry D. Yoho. In an order dated December 28, 1987, this Court ordered that the cause be tried before a Commissioner to determine whether the decedent was killed in the line of duty as defined in section 2(b) of the Act. (Ill. Rev. Stat., ch. 129, par. 402(b).) A hearing was held before Commissioner Robert G. Frederick. The Claimant has filed a brief, but the Respondent indicated it would not be filing a brief. Commissioner Frederick has duly filed his report.

On June 1, 1987, SP4 Larry D. Yoho arrived at Fort McCoy, Wisconsin, for his annual two-week summer camp training with his Illinois National Guard unit. On June 9, 1987, he fell from a second floor barrack balcony at Fort McCoy and on June 27, 1987, he died from injuries sustained in the fall.

An investigation by the Illinois National Guard followed the untimely death of SP4 Yoho. Major Edwin T. Lucas, of the Illinois National Guard, was appointed president of the board investigating SP4 Yoho's death.

The investigation and testimony at trial indicate that SP4 Yoho had been warned to stay off the balcony and to stay away from the ladder which led up to the balcony. Sergeant Whiteman had given this warning to two soldiers on June 8, 1987. One of those soldiers, PV2 Sowders, indicated that he and Yoho had been so warned. In fact, this type of warning had been given each year since 1971. This warning had occurred at the beginning of the two-week summer camp. However, Safety Officer Kelly's report indicates no warning was given at the initial briefing in June of 1987.

After arriving at Fort McCoy, the soldiers went out in the field. Upon completion of the training they came back to the containment area where the barracks are located. At the time of his death SP4 Yoho was on duty. He could not have left the containment area. Just prior to his death there was a company party. The troops have a party where food and alcoholic beverages are served. According to Major Lucas this was a traditional event and not against the rules. However, the reports indicate that the person who bought the beer was reprimanded. SP4 Yoho attended this party, had some drinks, went out on the balcony at about 11:15 p.m. to smoke a cigarette, and fell from the balcony. After being taken to a hospital, his blood-alcohol level as shown by a blood test was .225. The Respondent introduced no testimony as to what the blood-alcohol level would have been at the time of the accident. In fact, the Respondent introduced no competent evidence as to the significance of a reading of .225.

The balcony from which SP4 Yoho fell was not lighted at the time of the incident and the investigation indicated that the safety arm on the railing may have been in an open position. The investigation also found that while SP4 Yoho may have been negligent, which may have contributed to his fall, there was no evidence of intentional or willful misconduct on his part. This was only Yoho's second night in the barracks. He went out to the balcony and fell almost immediately.

Staff Sergeant Chambers saw SP4 Yoho at the party, but went to bed by 10:00 p.m. Yoho's eyes were glassy when seen by Sgt. Chambers, but he did not see any loss of coordination. SFC Miezo saw Yoho up until 9:15 p.m. At that time, Yoho exhibited no signs of intoxication. PV2 Sowders saw Yoho drink one or two

beers at about 6:30 p.m. and then did not see him again for a couple of hours. Later that evening Sowders had several drinks with Yoho, but Yoho did not appear intoxicated.

Sgt. Townsend stated that Yoho was with him at the gym between 8:30 p.m. and 9:30 p.m. on June 9, 1987. Yoho did not drink beer during this time and did not appear intoxicated. PFC Patterson saw Yoho talking just prior to his death and saw him walk out on the balcony. He did not feel Yoho was drunk. SP4 Patton also saw Yoho before the fall and did not feel he was drunk. The company party consisted of a 16-gallon keg of beer which was tapped about 6:00 p.m. Most of those who did not think Yoho was drunk had been drinking during the evening.

The reports, however, do indicate that a blood-alcohol concentration was taken upon Yoho's admission to the hospital and registered a .225 reading. It is important to note that SP4 Yoho was not admitted to the hospital until 1:37 a.m. on June 10, 1987, some 2½ hours after the fall. Captain Peters found that the cause of the accident was poor judgment and an extremely old and dangerous building condition. He discounted the alcohol based on the reports from the others at the party.

SP4 Yoho was initially taken to the Post-Troop Medical Clinic and then transferred by ambulance to St. Francis Hospital at LaCrosse, Wisconsin, where he was admitted at 1:37 a.m. on June 10, 1987. The diagnosis was fracture dislocation C6 and 7 with quadriplegia C-7. He died on June 27, 1987, of acute respiratory distress syndrome due to the fracture dislocation and quadriplegia.

The full title of the Act is "An Act in relation to the

payment of compensation on behalf of members of the Illinois National Guard killed while on duty and to make appropriations in connection therewith."

Section 2(b) of the Act states:

(b) "Killed in the line of duty" means losing one's life as a result of injury received while on duty as an Illinois national guardsman, if the death occurs within one year from the date the injury was received and if that injury arose from violence or any other accidental cause except that the benefits of this Act shall not be provided in the event a guardsman is killed while on active military service pursuant to an order of the President of the United States. The term excludes death resulting from the willful misconduct or intoxication of the guardsman; however, the burden of proof of such willful misconduct or intoxication of the guardsman is on the Attorney General."

The cases in the Court of Claims regarding the claims brought pursuant to the Act due to the death of National Guardsmen have been few and far between. There have been many cases in the Court of Claims brought pursuant to a similar statute, the short title of which is the "Law Enforcement Officers, Civil Defense Workers, Civil Air Patrol Members, Paramedics, Firemen and State Employees Compenation Act." (Ill. Rev. Stat. ch. 48, par. 281 *et seq.*) (hereinafter referred to as L.E.O.F.C.A.) However, comparisons are not helpful because it appears the legislature has determined a different title for that act and a different definition for the term "killed in the line of duty."

The full title of L.E.O.F.C.A. is "An Act in relation to the payment of compensation on behalf of law enforcement officers, civil defense workers, civil air patrol members, paramedics and firemen killed in the line of duty."

Section 2(e) of L.E.O.F.C.A. states:

(e) "killed in the line of duty" means losing one's life as a result of injury received in the active performance of duties as a law enforcement officer, civil defense worker, civil air patrol member, paramedic or fireman if the death occurs within one year from the date the injury was

received and if that injury arose from violence or other accidental cause. In the case of a State employee, "killed in the line of duty" means losing one's life as a result of injury received in the active performance of one's duties as a State employee, if the death occurs within one year from the date the injury was received and if that injury arose from a willful act of violence by another State employee committed during such other employee's course of employment and after January 1, 1988. The term excludes death resulting from the willful misconduct or intoxication of the officer, civil defense worker, civil air patrol member, paramedic, fireman or State employee. However, the burden of proof of such willful misconduct or intoxication of the officer, civil defense worker, civil air patrol member, paramedic, fireman or State employee is on the Attorney General. Subject to the conditions set forth in subsection (a) with respect to inclusion under this Act of Department of Corrections employees described in that subsection, for the purposes of this Act, instances in which a law enforcement officer receives an injury in the active performance of duties as a law enforcement officer include but are not limited to instances when:

(1) the injury is received as a result of a willful act of violence committed other than by the officer and a relationship exists between the commission of such act and the officer's performance of his duties as a law enforcement officer, whether or not the injury is received while the officer is on duty as a law enforcement officer;

(2) the injury is received by the officer while the officer is attempting to prevent the commission of a criminal act by another or attempting to apprehend an individual the officer suspects has committed a crime, whether or not the injury is received while the officer is on duty as a law enforcement officer;

(3) the injury is received by the officer while the officer is travelling to or from his employment as a law enforcement officer or during any meal break, or other break which takes place during the period in which the officer is on duty as a law enforcement officer."

It is apparent that an Illinois National Guardsman need only be *on duty* to receive benefits if, "the death occurs within one year of the injury and if the injury arose from violence or any other accidental cause * * *," while a law enforcement officer must be in the "active performance of duties as a law enforcement officer * * *." The reasoning behind this important distinction by the legislature may well be based on this Court's determination that such benefits to beneficiaries of National Guardsmen are required to render more attractive such military service to potential members of

the National Guard, and to afford protection to members thereof in activities which concededly are often extremely dangerous. (*See Ward v. State* (1962), 24 Ill. Ct. Cl. 229.) The statute serves as a "stimulant to voluntary military service, which service is of utmost importance to the safety, welfare and protection of the Nation and State." See *Ward.*

There is no question at all that SP4 Yoho was on duty on an annual two-week training exercise at Fort McCoy in the containment area at the time of the injury which caused his death. He was not on active military service pursuant to an order of the President of the United States, which would prevent an award from being granted. (See section 2(b) of the Act.) He was assigned to the company barracks and could not leave. As the Act requires only that he be on duty, he has met that requirement.

The more troubling aspect of this case is whether the exclusions of the statute apply under the circumstances of the case. The statute states that the term " 'killed in the line of duty' * * * excludes death resulting from the willful misconduct or intoxication of the guardsman; however, the burden of proof of such willful misconduct or intoxication of the guardsman is on the Attorney General."

Before the decedent walked out on an unlit, dangerous balcony he attended a company party and drank at least several beers over the course of the evening. All those who saw the decedent at different times prior to the fall state he did not appear intoxicated. Some of these soldiers were also drinking. Two hours and 15 minutes after the fall the decedent, upon admission to the hospital, had a blood-alcohol level of .225.

As previously stated, there was no proof presented by the Respondent as to a blood-alcohol level at the time of the fall and the Respondent did not present any competent evidence as to the meaning of the .225 reading later at the hospital. It is not for this Court to guess at the significance of a .225 reading. It was incumbent on the Respondent to make an evidentiary record of the significance of a .225 reading, which is not an appropriate area for judicial notice. The Respondent has not met its burden of proof that the decedent's death was caused by his own willful misconduct or intoxication. It is more likely than not that the unsafe building and lighting caused the fall.

Based on the foregoing, we find that an award should be granted in this claim. It appears from the record that SP4 Yoho did not have a beneficiary designated to receive an award pursuant to the Act and was not survived by a spouse or children. It such a case, section 3(c) of the Act provides that the surviving parents are entitled to receive an award in equal parts. It is therefore hereby ordered that an award totalling $20,000 is granted in this claim. Said award is to be divided equally between the Claimant, Warren H. Yoho, the decedent's surviving father, and Maridell A. Yoho, the decedent's surviving mother.